IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

KIMBERLY BECK,

        Plaintiff,

      vs.                          Civ. No. 21-726  MV/JFR

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration,

        Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on the Social Security Administrative Record
(Doc. 13)[2] filed October 22, 2021, in connection with Plaintiff's *Motion to Reverse and Remand
and Memorandum Brief,* filed January 5, 2022.  Doc. 20.  Defendant filed a Response on
April 6, 2022.  Doc. 26.  Plaintiff filed a Reply on April 20, 2022.  Doc. 27.  The Court has
jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).
Having meticulously reviewed the entire record and the applicable law and being fully advised in
the premises, the Court finds that Plaintiff's motion is well taken and recommends that it be
**GRANTED**.

## I. Background and Procedural Record

Plaintiff Kimberly Beck ("Ms. Beck") alleges that she became disabled on March 15,
2015, at the age of thirty-two years and nine months, because of post-traumatic stress syndrome,

---

[1] On February 25, 2021, United States District Judge Martha Vazquez entered an Order of Reference referring this
case to the undersigned to conduct hearings, if warranted, including evidentiary hearings and to perform any legal
analysis required to recommend to the Court an ultimate disposition of the case.  Doc. 22.

[2] Hereinafter, the Court's citations to Administrative Record (Doc.13), which is before the Court as a transcript of the
administrative proceedings, are designated as "Tr."

social anxiety, and high blood pressure.  Tr. 64-65.  Ms. Beck completed high school in 2000, and has worked as a retail cashier and sales associates, a fast food crew worker, and temporary worker.  Tr. 191, 200-05.  Ms. Beck stopped working on March 10, 2015, because of her medical conditions.  Tr. 190.

On October 17, 2017, Ms. Beck protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq.  Tr. 14, 165-70. On July 18, 2019, Ms. Beck's initial application was denied.  Tr. 63, 64-74, 88-91.  On October 16, 2019, Ms. Beck's application was denied at reconsideration.  Tr. 75, 76-86, 95-99. Thereafter, Ms. Beck requested a hearing.  Tr. 102-04.  On October 20, 2020, Administrative Law Judge (ALJ) Michelle K. Lindsay held a hearing.  Tr. 28-62.  Ms. Beck was represented by Attorney Benjamin Decker.[3]  Id.  On November 13, 2020, ALJ Lindsay issued an unfavorable decision.  Tr. 11-24.  On June 1, 2021, the Appeals Council issued its decision denying Ms. Beck's request for review and upholding the ALJ's final decision.  Tr. 1-6.  On August 4, 2021, Ms. Beck timely filed a Complaint seeking judicial review of the Commissioner's final decision.  Doc. 1.

## II.  Applicable Law

### A.      Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Commissioner has

---

[3] Ms. Beck is represented in these proceedings by Attorney Justin S. Raines.  Doc. 1.

adopted the familiar five-step sequential analysis to determine whether a person satisfies the

statutory criteria as follows:

> (1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[4]  If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

> (2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

> (3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement.  If so, a claimant is presumed disabled.

> (4) If, however, the claimant's impairments do not meet or equal in severity one of the listings described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* §§ 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work.  Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

> (5) If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4)

(supplemental security income); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10ᵗʰ Cir. 2005);

---

[4] Substantial work activity is work activity that involves doing significant physical or mental activities.  20 C.F.R. §§ 404.1572(a).  "Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b).

*Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n.5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

### B.   Standard of Review

The Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).  A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley*, 373 F.3d at 1118, or if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed."  *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).  In undertaking

its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

## III. <u>Analysis</u>

The ALJ made her decision that Ms. Beck was not disabled at step five of the sequential evaluation. Tr. 22-24 The ALJ determined that Ms. Beck had not engaged in substantial gainful activity since October 17, 2017, her application date. Tr. 16. She found that Ms. Beck had severe impairments of generalized anxiety disorder, major depressive disorder, post-traumatic stress disorder, and cannabis use disorder. *Id.* The ALJ found nonsevere impairments of hypothyroidism, essential hypertension, obstructive sleep apnea, obesity and history of alcohol abuse. *Id.* The ALJ determined, however, that Ms. Beck's impairments did not meet or equal in severity any of the listings described in the governing regulations, 20 CFR Part 404, Subpart P, Appendix 1. Tr. 17-19. Accordingly, the ALJ proceeded to step four and found that Ms. Beck had the residual functional capacity to

> perform a full range of work at all exertional levels but with the following non-exertional limitations: The claimant is able to understand, remember, and carry out simple instructions with a reasoning level of no more than 2. She is able to maintain attention and concentration to perform and persist at simple tasks at an adequate pace for two hours at a time without requiring redirection to task throughout a normal eight-hour workday and forty-hour workweek with standard breaks. She requires work that does not involve interaction with the general public. She is able to interact appropriately with co-workers and supervisors on a superficial basis. She requires work involving no more than occasional change in the routine work setting, and no more than occasional independent goal setting or planning.

Tr. 122. The ALJ determined that Ms. Beck was unable to perform any past relevant work, but that considering Ms. Beck's age, education, work experience, and residual functional capacity,

there are jobs that exist in significant numbers in the national economy that she can perform.[5] Tr. 26-27.  The ALJ, therefore, concluded that Ms. Beck was not disabled.  Tr. 27.

In support of her Motion, Ms. Beck argues that (1) the ALJ failed to consider or even mention treating provider CNP Andrea Elizabeth Ensign's assessed GAF scores related to Ms. Beck's ability to function; (2) the ALJ ignored the support for CNP Ensign's medical assessment of Ms. Beck's ability to do work-related mental activities; and (3) the ALJ failed to properly consider at step three that Ms. Beck was in a supportive environment through psychosocial rehabilitation.  Doc. 20 at 18-25..

For the reasons discussed below, the Court finds that the ALJ failed to properly consider probative medical evidence regarding Ms. Beck's ability to do work-related mental activities. As such, the Court recommends this case be remanded.

### A.  Medical Opinion Evidence Related to Ms. Beck's Ability To Do Work-Related Mental Activities

#### 1.  Andrea Elizabeth Ensign, CNP

On March 8, 2017, Ms. Beck presented to the University of New Mexico Psychiatric Center START[6] Clinic for evaluation of psychiatric symptoms.  Tr. 302-05.  Ms. Beck was referred by her primary care provider, Molly McCain, M.D.[7]  Id.  CNP Ensign took various

---

[5] The vocational expert testified that Ms. Beck would be able to perform the requirements of representative occupations such as a Hand Packager, DOT 921.587-018, which is performed at the medium exertional level with an SVP of 2 (500,000 jobs in the national economy); a Janitor, DOT 381.687-018, which is performed at the medium exertional level with an SVP of 2 (1 million jobs in the national economy); and a Store Laborer, DOT 922.687-058, which is performed at the medium exertional level with an SVP of 2 (395,000 jobs in the national economy).  Tr. 23.

[6] Short-Term Assessment for Recovery and Treatment.

[7] On January13, 2017, Ms. Beck established primary care with Molly McClain, M.D.  Ms. Beck reported a medical history of hypertension, PTSD, anxiety and substance use disorder including cannabis and alcohol.  Tr. 278-80. Ms. Beck reported taking Venlafaxine and BuSpar for depression and anxiety, and seeing John David Gray, Ph.D., for counseling.  Id.  Ms. Beck also reported taking Prazosin for nightmares.  Id.  Ms. Beck reported a childhood diagnosis of schizophrenia.  Id.  Dr. McClain assessed Ms. Beck with, inter alia, anxiety with symptoms of great social anxiety and anxiety about leaving her home.  Id. Dr. McClain planned to refer Ms. Beck for psychiatric evaluation.  Id.

histories including Ms. Beck's history of present illness,[8] childhood and developmental history, past psychiatric history, and past medical history.  *Id.*  On mental status exam, CNP Ensign indicated Ms. Beck was pleasant and cooperative, had adequate cognition, language and knowledge, and had fair attention/concentration, memory, insight and judgment.  Tr. 304. Ms. Beck reported her mood as "feeling pretty good."  *Id.*  CNP Ensign made initial Axis I diagnoses of Cannabis Use Disorder, moderate; Alcohol Use Disorder, in FSR;[9] PTSD; r/o Psychotic Disorder NEC.  *Id.*  At Axis V, CNP Ensign assessed a GAF score of 50.[10]  CNP Ensign summarized her initial assessment as follows:

> 34 year old female with a chart history of PTSD, anxiety, alcohol use disorder in FSR and cannabis use disorder.  Presents to START wanting a clearer psychiatric evaluation in the context of locating childhood records diagnosing patient with schizophrenia and patient attempting to qualify for SSI.  She does endorse AH x 4-5 years which are not degrading or derogatory but remain distressing.  No other psychotic symptoms are elicited including delusions, paranoia, disorganization. The clinical picture is further complicated by regular, every 30 minutes, use of marijuana for the past 2 years.  She is experiencing an increase in sleep disturbance and has a history of angry outbursts which cause difficulty for patient so a trial of an anti-psychotic to target AH, impulse control and sleep is discussed and patient is amenable.  Patient is a good candidate for PSR[11] services and is interested in a referral.  No acute issues of SI or HI and patient is appropriate to remain in outpatient care.

---

[8] Ms. Beck reported, *inter alia*, auditory hallucinations for 4-5 years; being unmotivated to return to work and spending her days at home watching tv; anxiety in social situations and not wanting to leave her home; needing to smoke marijuana to leave her home; experiencing racing heart, sweating, and agitation in social situations; difficulty with authority figures; and angry outbursts resulting in being arrested for disorderly conduct.  Tr. 302.

[9] Full Sustained Remission.

[10] The GAF is a subjective determination based on a scale of 100 to 1 of a "clinician's judgment of the individual's overall level of functioning."  *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 34.

[11] Psychosocial Rehabilitation.

Tr. 304-05. CNP Ensign referred Ms. Beck to PSR,[12] prescribed Risperidone, and encouraged Ms. Beck to decrease marijuana use to every two hours.  Tr. 305.

Ms. Beck saw CNP Ensign nineteen times from March 8, 2017, through October 1, 2019.[13]  Tr. 302-05, 305-09, 309-13, 349-552, 352-56, 356-60, 361-63, 363-66, 366-70, 370-73, 374-77, 377-80, 380-84, 384-87, 387-90, 391-94, 394-98, 536-39, 688-91.  CNP's mental status exams remained largely consistent with her initial mental status exam, although she modified her assessment of Ms. Beck's affect and amended her assessment of Ms. Beck's insight and judgment as "fair-to-poor."  *Id.*  By August 8, 2017, however, CNP Ensign had amended her Axis I diagnoses to include major depressive disorder and generalized anxiety disorder, which remained unchanged thereafter.  Tr. 308, 351, 355, 358, 362, 365, 369, 373, 376, 379, 538, 699. Throughout the entirety of her approximately three-year treatment period of Ms. Beck, CNP Ensign's Axis V GAF scores remained at either 49 or 50.[14]  Tr. 304, 308, 312, 355, 358, 362, 365, 369, 373, 376, 380, 383, 386, 390, 393, 397, 538.

CNP Ensign's treatment notes reflect that Ms. Beck's reports of and CNP Ensign's assessment of Ms. Beck's mental impairment status varied between, on the one hand, improved

---

[12] Ms. Beck first attempted Psychosocial Rehabilitation in April 2017.  Tr. 344-45, 492-97.  She arrived for orientation wearing a t-shirt with a marijuana plant on it.  Tr. 345.  She was informed by the staff about safety and safety rules and was asked not wear that type of clothing to PSR.  *Id.*  Ms. Beck subsequently withdrew.  Tr. 342-43.  Ms. Beck attempted Psychosocial Rehabilitation for a second time two years later in August 2019.  Tr. 486-91, 528-29.  She identified her goals, *inter alia*, as socializing with people and trying to start conversations.  Tr. 503.  The Administrative Record indicates she attended a Jewelry and Sewing class on August 26, 2019, and September 9, 2019, at which she engaged in creating bracelets and necklaces using beads and other supplied materials; she was noted to have participated well in group discussion and was able to verbalize or demonstrate understanding of content (Tr. 525, 528); she attended a Friday Activity Day class on September 6, 2019, at which she had the option of going on an outing to the State Fair but chose to remain at PSR; she was noted to have participated well in group activity (Tr. 526); and Ms. Beck attended a Weekly Check In on September 9, 2019, at which Ms. Beck was able to review progress of her goals and discuss concerns.  Tr. 524.

[13] On January 20, 2020, Ms. Beck changed providers at the START Clinic and is now seeing CNP Susan Paula Eastman.  Tr. 684-87.

[14] *See* fn. 10, *supra*.

mood and decreased symptoms of depression and significant anxiety due to medication adjustments (Tr. 308, 312, 355, 358, 362, 366, 373, 376, 380, 386, 390, 393, 538) and, on the other hand, increased depression, anxiety and irritability and ongoing significant problems with social isolation and seldom interaction with anyone (Tr. 351, 369, 373, 380, 383, 690).  CNP Ensign consistently noted that Ms. Beck's clinical picture was complicated by regular marijuana use for managing her anxiety, *i.e.,* anywhere from every 30 minutes to every two hours, every day.  Tr. 304, 308, 312, 351, 355, 359, 362, 366, 369, 373, 376, 380, 383, 386, 390, 393, 397, 536.  At various times, CNP Ensign indicated that Ms. Beck's progress with coping with stress and mental illness was fair.  Tr. 308, 312, 390, 393, 397.

Seven months into treatment, on October 4, 2017, CNP Ensign prepared a *Medical Impairment Questionnaire* on Ms. Beck's behalf.  Tr. 693-95.  CNP Ensign listed Ms. Beck's mental impairments as PTSD, major depression, rec., mod., general anxiety disorder, and cannabis use disorder.  Tr. 693.  She identified Ms. Beck's signs and symptoms as (1) short term, intermediate or long term memory impairment; (2) sleep disturbance; (3) personality change; (4) persistent disturbances of mood or affect; (5) emotional withdrawal and/or isolation; (6) blue or flat or inappropriate affect; (7) delusions, hallucinations or paranoid thinking; (8) persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity or situation; (9) recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, occurring on the average of at least once a week; (10) recurrent and intrusive recollections of a traumatic experience which are a source of marked distress; (11) pathological dependence, passivity, or aggressively; and (12) marked restricted repertoire of activities and interests.  *Id.*  She indicated that "[p]atient's symptoms and

mood disturbance are severe, chronic and disabling," and that Ms. Beck's mental impairments interfered in all areas of her functioning.  Tr. 693-94.

She assessed that Ms. Beck had *moderate limitations* in her ability to (1) remember locations and work-like procedures; (2) make a simple work-related decision; and (3) maintain socially appropriate behavior and adhere to basic standards of neatness/cleanliness.  Tr. 694.  She further assessed that Ms. Beck had *marked limitations* in her ability to (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, be punctual and maintain regular attendance; (3) work in coordination with or proximity to others without being distracted; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers without distracting them or exhibiting extreme behaviors; and (7) respond appropriately to changes in the work setting.  *Id.*  Finally, CNP Ensign indicated that Ms. Beck likely would be absent from work more than three times month due to her mental impairments or treatment related thereto.  *Id.*

The ALJ found CNP Ensign's opinion unpersuasive explaining that it was not supported by her treatment records.  Tr. 22.  The ALJ explained that CNP Ensign's "extreme restrictions" were contradicted by the longitudinal evidence, which showed "mild" findings on mental status examinations and generally steady improvement with treatment and medication.  *Id.*  The ALJ noted that Mr. Beck usually reported doing "good" or "okay" on mental status exam and was able to participate in, and interact appropriately, at jewelry making and Spanish classes.  *Id.*

### 2.   Richard Sorensen, Ph.D.

On July 3, 2019, nonexamining State agency psychological consultant Richard Sorensen, Ph.D., reviewed the medical evidence record at the initial level of review.[15]  Tr. 67-72.

---

[15] Dr. Sorensen indicated he reviewed Ms. Beck's Function Report and eight treatment notes from various UNM providers all generated in 2018 and 2019.  Tr. 68.  Four of the eight treatment notes Dr. Sorensen reviewed were

Dr. Sorensen prepared a Psychiatric Review Technique ("PRT")[16] and rated the degree of

Ms. Beck's functional limitation in the area of understanding, remembering or applying

information as *mild*; in the area of interacting with others as *moderate*; in the area of maintaining

concentration, persistence or pace as *moderate*, and in the area of adapting or managing oneself

as *mild*.  Tr. 68.

Dr. Sorensen also prepared a Mental Residual Functional Capacity Assessment

("MRFCA") in which he found in Section I that Ms. Beck had *moderate* limitations in her ability

to (1) understand and remember detailed instructions; (2) carry out detailed instructions;

(3) maintain attention and concentration for extended periods; (4) work in coordination with or in

proximity to others without being distracted by them; (5) complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods; (6) interact

appropriately with the general public; (7) accept instructions and respond appropriately to

criticism from supervisors; and (8) get along with coworkers or peers without distracting them or

exhibiting behavioral extremes.  Tr. 70-72.

In Section III, Dr. Sorensen assessed that

> [t]he claimant can understand, remember and carry out simple instructions, make
> simple decisions, attend and concentrate for two hours at a time, interact adequately
> with co-workers and supervisors, and respond appropriately to changes in a routine
> work setting.

---

authored by CNP Ensign.  *Id.*  The reviewed medical evidence did not include CNP Ensign's *Medical Impairment Questionnaire.*

[16] "The psychiatric review technique described in 20 CFR §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings.  The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process."  SSR 96-8p, 1996 WL 374184, at *4.

Would do best in a position requiring minimal social interaction.

Tr. 72.

The ALJ found Dr. Sorensen's assessment persuasive explaining that it was supported by an analysis of the evidence of record available at the time and "consistent with the evidence, which shows some symptoms of anxiety and mental distress, but balances these symptoms against the evidence of improvement with conservative treatment, routinely normal or mild mental status findings, no acute distress, ability to interact in a socially appropriate manner, and intact cognitive functioning."  Tr. 21-22.

### 3.      Debby Doughty, Ph.D.

On October 15, 2019, nonexamining State agency psychological consultant Debby Doughty, Ph.D., reviewed the medical evidence record at reconsideration.[17]  Tr. 80-85. Dr. Doughty prepared a PRT and rated the degree of Ms. Beck's functional limitation in the area of understanding, remembering or applying information as *mild*; in the area of interacting with others as *moderate*; in the area of maintaining concentration, persistent and pace as *moderate*; and in the area of adaptation as *mild*.  *Id.*

Dr. Doughty also prepared a MRFCA in which she found in Section I that Ms. Beck had *moderate limitations* in her ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or in proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) accept instructions and respond appropriately to criticism from supervisors; and

---

[17] Dr. Doughty listed the same eight treatment records from UNM that Dr. Sorensen reviewed.  Tr. 81-82.

(7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

Tr. 84-85.  Dr. Doughty found that Ms. Beck had a *marked limitation* in her ability to interact

with the general public.  Tr. 85.

> In Section III, Dr. Doughty assessed that

> the claimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for 2 hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting.

> Would do best in a position requiring minimal social interaction.

Tr. 117.

The ALJ's evaluation of Dr. Doughty's assessment was identical to her evaluation of

Dr. Sorensen's assessment.  Tr. 21-22.

**B.**     <u>**Legal Standard**</u>

An ALJ evaluates the persuasiveness of medical opinions based on: (1) the degree to

which the opinion is supported by objective medical evidence and supporting explanation;

(2) how consistent the opinion is with other evidence in the record; (3) the source's treating

relationship with the claimant (i.e., how long/frequently the source treated the claimant and for

what purpose); (4) whether the source was specialized on the impairment on which he or she is

opining; and (5) any other factor tending to support or contradict the opinion.  20 C.F.R. §§

404.1520c(c)(1)-(5), 416.920c(c)(1)-(5).  The most important factors are "supportability ... and

consistency."  20 C.F.R. §§ 404.1520c(a), §§416.920c(a).  The SSA does not give "any specific

weight, including controlling weight, to any medical opinion(s)." *Id.*

In considering the persuasiveness of medical opinions, the ALJ "must discuss the weight

he assigns." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  The ALJ is not

required to discuss each factor articulated in the regulations; rather, the ALJ must merely explain

his weighing decision with sufficient specificity so as to be capable of review.  *See Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  Put differently, if an ALJ rejects an opinion, he "must then give 'specific, legitimate reasons for doing so.' "  *Id.* (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)).  Failure to do so constitutes legal error.  *See Kerwin v. Astrue*, 244 F. App'x. 880, 884 (10th Cir. 2007) (unpublished).  In addition, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability."  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) (citations omitted).  Instead, an ALJ "must ... explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184, at *7.  Further, the Commissioner may not rationalize the ALJ's decision post hoc, and "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter v. Astrue*, 537 F.3d 1264, 1267 (10th Cir. 2008) (citation omitted).

B.   **The ALJ Failed to Consider Probative Medical Evidence When Evaluating CNP Ensign's Opinion Related To Ms. Beck's Ability To Do Work-Related Mental Activities**

Ms. Beck argues that the ALJ ignored probative medical evidence that was supportive of CNP Ensign's medical opinion regarding Ms. Beck's ability to do work-related mental activities. Doc. 20 at 20-23.  For instance, Ms. Beck argues that the ALJ improperly ignored CNP Ensign's explanation of the objective evidence in her opinion and treatment notes, and ignored CNP Ensign's Axis V GAF scores which provided longitudinal support for her opinion that Ms. Beck was moderately and markedly limited in her ability to do work-related mental activities.  *Id.* Ms. Beck further argues that the ALJ improperly mischaracterized CNP Ensign's mental status

exam findings as "mild" and her assessed moderate and marked limitations as "extreme" to find

CNP Ensign's opinion unpersuasive.[18]  *Id.*

The Commissioner broadly contends that the ALJ reasonably assessed the medical

evidence.  Doc. 26 at 10-12.  More specifically, the Commissioner first contends that under the

new medical evidence rules GAF scores are not "medical opinions."  Doc. 26 at 10-12.  Thus,

the Commissioner contends, the "ALJ reasonably considered and cited to the treatment records

containing the GAF scores but focused on the objective medical findings and Plaintiff's self-

reports contained therein."  *Id.*  The objective evidence, the Commissioner asserts, was more

probative and relevant to Plaintiff's functioning that some arbitrary GAF score "which is not

even used in the DSM anymore because of 'its conceptual lack of clarity . . . and questionable

psychometrics in routine practice.' "  *Id.* (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical*

*Manual of Mental Disorders* 16 (5th ed. 2013)).

The Commissioner goes on to assert that to the extent the GAF scores suggest greater

limitations, the ALJ did in fact evaluate CNP Ensign's October 2017 opinion such that there is

no need to remand this case "so that the ALJ can redundantly evaluate the GAF scores that align

with an opinion the ALJ reasonably considered but rejected."  *Id.*  The Commissioner further

---

[18] Ms. Beck cites the Administration's Program Operations Manual System which provides, *inter alia*, that impaired judgment effects a claimant's "ability to make simple work-related decisions" and "to be aware of normal hazards and take appropriate precautions."  Doc. 20 at 22-23 (citing *Mental Limitations*, POMS DI 25020.010(B)(2)(b)).  Here, Ms. Beck argues, CNP Ensign repeatedly assessed on mental status exam that Ms. Beck's insight and judgment were "fair to poor."  *Id.*

Ms. Beck also cites SSA regulations which provide definitions related to its five-point scale to rate the degree of limitation, *i.e.,* none, mild, moderate, marked, and extreme.  *Id.* (citing Listing 12.00(F)(a)-(e)).  Specifically, Ms. Beck explains that an extreme limitation means "[y]ou are not able to function in this area independently, appropriately, effectively, and on a sustained basis," whereas a "marked limitation" means, "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited[,]" and "moderate limitation means "[y]our functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."  *Id.* Ms. Beck argues it was improper for the ALJ to reject the SSA's definitions by exaggerating and mischaracterizing CNP Ensign's assessed limitations.

asserts that Ms. Beck's argument that the ALJ did not consider the medical evidence when she

evaluated CNP Ensign's opinion is "merely a claim that the ALJ should have interpreted the

evidence differently." Here, the Commissioner asserts, the ALJ correctly found that CNP

Ensign's opinion was unpersuasive because it was not supported and was inconsistent with her

treatment records. *Id.*

To begin, the Commissioner correctly notes that the GAF scale was dropped from the

DSM-V due to its "lack of clarity" and "questionable psychometrics." *American Psychiatric*

*Association, Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013). However,

the Commissioner's argument that the GAF scores can be ignored on that basis is unavailing.

The SSA's Administrative Message 13066 from 2013 indicates that GAF scores should still be

considered, just not in isolation. *Sizemore v. Berryhill*, 878 F.3d 72, 82 (4th Cir. 2017) (citing

Soc. Sec. Admin., Administrative Message-13066 (July 22, 2013)); *see also, e.g.*, *Knapp v.*

*Berryhill*, 741 F. App'x 324, 329 (7th Cir. 2018) ("Although another metric has replaced the

GAF, the agency still considers these scores as relevant, medical-opinion evidence") (citing

Administrative Message 13066)); *Craig v. Colvin*, 659 F. App'x 381, 382 (9th Cir. 2016) ("[T]he

Social Security Administration (SSA) has endorsed [the] use [of GAF scores] as evidence of

mental functioning for a disability analysis.") (citing Administrative Message 13066)); *Senyszyn*

*v. Saul*, Civil Action No. 18-4046, 2019 WL 3252950, at *3 n.14 (E.D. Pa. July 19, 2019)

("Although the fifth edition of the DSM eliminated reference to the GAF score, the

Commissioner continues to receive and consider GAF scores in medical evidence, and an ALJ

must consider a GAF score with all of the relevant evidence in the case file.") (internal citation

omitted) (citing Administrative Message 13066)). Moreover, the SSA's own training manual

specifically stipulates that "*for claims filed on or after March 27, 2017*, we consider a GAF score

to be 'other medical evidence.'"  Soc. Sec. Admin., *Supplemental ALJ Training Notebook*, p. 35 (2017).  Thus, while the new regulations for evaluating medical evidence for claims filed on or after March 27, 2017, as is the case here, may have redefined GAF scores from "medical opinion" to "other medical evidence," the new regulations do not permit the ALJ to completely ignore them as the ALJ did here.

Next, the Commissioner's argument that there is no need to remand the case so that the ALJ can "redundantly evaluate the GAF scores that align with an opinion the ALJ reasonably considered but rejected" is contrary to the applicable legal standards.  An ALJ must demonstrate that she considered all of the evidence and must discuss uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejected.  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).  Here, CNP Ensign consistently assessed Axis V GAF scores of 49 or 50 over the course of approximately three years of treatment.[19]  These low scores are consistent with serious symptoms and/or serious impairment in social and occupational functioning which the Tenth Circuit considers relevant and concerning evidence related to a claimant's ability to keep a job.  *See generally*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . ." but "[a] GAF score of fifty or less, . . . does suggest an inability to keep a job.").  Moreover, the GAF scores in CNP Ensign's treatment notes *support* her assessment that Ms. Beck has moderate and marked limitations in her ability to do work-related mental activities

---

[19] On January 20, 2020, Ms. Beck changed providers at the START Clinic is now seeing CNP Susan Paula Eastman. Tr. 684-87.  On Ms. Beck's initial visit with CNP Eastman, CNP Eastman assessed an AXIS V GAF score of 50.  Tr. 686.

which undermines the ALJ's explanation that CNP's Ensign's opinion was "not supported by . . . treatment records."  Tr. 22.  The ALJ's failure to consider or even mention this evidence in her evaluation of CNP Ensign's opinion evidence is legal error.

Additionally, separate and apart from the ALJ's failure to consider the GAF scores, the Court is not persuaded that the explanations the ALJ provided for findings CNP Ensign's opinion evidence unpersuasive are supported by substantial evidence.  For example, on the *Mental Impairment Questionnaire* CNP Ensign completed on Ms. Beck's behalf, she specifically identified Ms. Beck's impairments, along with twelve signs and symptoms that support her diagnoses.  Tr. 693.  The ALJ makes no mention of these nor does she discuss whether they have support in CNP Ensign's treatment notes.  Instead, the ALJ relies almost exclusively on what she characterizes as "mild" mental status exams[20] and "steady improvement," but does so to the exclusion of CNP Ensign's consistent Axis I diagnoses and medication treatment, her assessment notes which indicate Ms. Beck's ongoing significant social isolation, and her repeated concern that Ms. Beck's clinical picture was complicated by regular marijuana use for anxiety.  The ALJ also relies on Ms. Beck's attendance at two jewelry and sewing classes in a psychosocial rehabilitation setting, where she was noted to have participated, as part of the *longitudinal* evidence to dispute CNP Ensign's "extreme" restrictions.[21]  Tr. 22.

In sum, the ALJ engaged in picking and choosing among CNP Ensign's treatment notes, using only those portions of evidence favorable to her position while ignoring other evidence.  This is error.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted)

---

[20] *See* fn. 18, *supra*.

[21] *See* fn. 12, *supra*.

("It is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence.").

### C.    <u>Remaining Issues</u>

The Court will not address Ms. Beck's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### IV.  <u>Recommendation</u>

For all of the reasons stated above, the Court finds that Ms. Beck's Motion to Reverse and Remand and Memorandum Brief (Doc. 20) is well taken and recommends that it be **GRANTED.**

---

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

**JOHN F. ROBBENHAAR**
**United States Magistrate Judge**